THE PEOPLE OF THE STATE OF NEW YORK, Plaintiffs, *v.* JAMES C. LIVINGSTON, JR., and Others, Defendants.

Supreme Court, Hamilton County, June 9, 1926.

Boundaries — northern boundary line of Jerseyfield patent established — passive acquiescence by local landowners or public officials in different boundary line does not establish said line on principle of practical location — acquiescence rests either upon principle of ratification or of equitable estoppel.

The line beginning at the northern end of a line extending from the northeast corner of the Royal Grant in the direction of seventy-four degrees east as the magnetic needle played in the year 1769 through the distance of 708 chains, and passing from said northern end, in the course fifty-eight degrees west as the magnetic needle played in the year 1769 to West Canada creek, is the true northern boundary line of the Jerseyfield patent.

Mere passive acquiescence by local landowners or public authorities in a different line or lines as the said northern boundary line does not establish the different line as such boundary on the principle of practical location.

Acquiescence rests either upon the principle of ratification or that of equitable estoppel.

Supreme Court, June, 1926.          [Vol. 128

Action in ejectment affecting about 500 acres of wild vacant forest land within the limits of the State Forest Preserve and the Adirondack Park in the towns of Morehouse and Arietta, county of Hamilton.

The land lies in what is commonly called the " Brayhouse " or " Bray House " gore and is bounded on the north by what is known as the Brayhouse line and on the south by the northern boundary line of the Jerseyfield patent. The easterly and westerly sides are the production northerly across the so-called " gore " of the easterly line of lot 89 and the westerly line of lot 88 in the patent of land lying to the south commonly called Jerseyfield. The width of the so-called gore at this point is approximately twenty-eight chains. The case was tried before Frederick Collin, as official referee at Johnstown on March 4, 1924.

It was contended by the plaintiffs that the true northerly boundary line of the Jerseyfield patent was the Indian or Transit line and they further contended that the premises in litigation were a part of a patent, northerly of and adjoining Jerseyfield patent, given to one Jonathan Lawrence, in 1770, which was partitioned among the successors in interest of said patentee in 1806, in which partition the said Brayhouse gore was created and the land therein remained unallotted. The plaintiffs secured their title to said strip or gore through a subsequent partition among the successors in title of said Lawrence.

The defendants contended that the Brayhouse line was the true northerly boundary of the Jerseyfield patent and that their title to the northerly lots in the latter grant extended to said line. By statutory provision the northerly boundary of Jerseyfield is made the boundary between the counties of Hamilton and Fulton at the point in question. The defendants further maintained that the plaintiffs were estopped to deny the identity of the location of the county lines with the Brayhouse line by reason of the official acts of recognition by the State and its subdivisions and because of agreement upon and practical location of said line by the parties and their predecessors. It was also contended that a previous litigation between the plaintiffs and James C. Livingston, Sr., and one Bowers was decisive of the questions raised.

The remaining material facts are stated in the opinion.

*Albert Ottinger, Attorney-General* [*Eric J. Lake, Deputy Attorney-General,* of counsel], for the plaintiffs.

*Robert F. Livingston,* for the defendants.

Frederick Collin, Official Referee. The plaintiffs seek in this action in ejectment a judgment awarding to them the possession,

and establishing their ownership in fee, of a tract of land described in the complaint as follows:

" All that tract or parcel of land bounded as follows: Beginning at the north-east corner of lot No. 89 in the patent of 94,000 acres of land granted in the year 1770 to Henry Glenn and Others and commonly called the Jerseyfield Patent and running thence in a northerly direction on a continuation of the east line of said lot No. 89 Jerseyfield Patent to a point where said east line continued would intersect the so-called Brayhouse Line, the south line of lot No. 8, Lawrence Patent; thence westerly along said Brayhouse Line, being the south line of lots Nos. 8, 9 and 10 of Lawrence Patent, to a point where the west line of lot No. 88, Jerseyfield Patent would, if continued northerly, intersect the said Brayhouse Line; thence southerly across the so-called Gore to a point on what is known as the Transit Line at the north-west corner of Lot 88 Jerseyfield Patent; thence easterly along the so-called Transit Line to the place of beginning."

It is alleged also that the tract is within and forms part of the Forest Preserve and the Adirondack Park of the State of New York.

The answer includes, *inter alia,* a general denial, and allegations, in effect, that the description locates the tract as that part of the " so-called gore " north of lots 88 and 89 of the " so-called Jerseyfield patent " and south of the " so-called Brayhouse line," and makes the " so-called Transit line " the northern boundary of the Jerseyfield patent. It alleges there is not such a tract, because the Brayhouse line is the true northern boundary of the Jerseyfield patent, and of the designated Jerseyfield lots 88 and 89, owned by the plaintiffs, and it asks a judgment establishing that allegation as a fact. It has other allegations which I do not here refer to.

It is not necessary to narrate the sources and devolutions of the respective titles. Undisputedly, the designated lots are owned by the defendants and are contiguous to the north line of the Jerseyfield patent. Undisputedly the plaintiffs own so much of the described land, if any there be, as lies between such north line and the Brayhouse line. The determination of the true and correct location of the northerly line of the Jerseyfield patent is primarily compelled by the evidence and briefs of counsel.

April 12, 1770, the Crown issued to petitioners Henry Glen and ninety-three other named persons letters patent of that date, granting unto them the tract of land since known as Jerseyfield or Jerseyfield patent. The tract is defined by a precise and clear statement of its boundary lines. A line running from a designated and described white pine tree 708 chains on a course seventy-four

degrees east is its easterly boundary, a line thence 1,847 chains to Canada or West Canada creek, on a course fifty-eight degrees west, is its northern boundary, a line thence down the creek to the northern boundary line of the Royal Grant is its western boundary, and the northern boundary line of the Royal Grant is its southern boundary.

The letters patent contained, *inter alia*, recitals of the presentation to Sir Henry Moore, Governor in Chief of the Province of New York, of a petition of Henry Glen and the ninety-three others, which set forth that by the permission of the Governor in Chief the petitioners on June 11, 1768, procured the Indians belonging to the Canajoharie Castle to convey to the Crown:

" All their native and original Indian Right to a certain Tract of Land Situate in the County of Albany on the North side of the Mohawk River, and Northerly of a Tract lately Surveyed for Sir William Johnson, the same being more particularly bounded and described as by the Indian Deed for the same may appear: And therefore the Petitioners did humbly pray that our Letters Patent might issue to vest them and each of their Associates in fee simple with the Quantity of one thousand Acres of the said Lands, or with such quantity as the whole amount of the aforesaid Purchase would permit of, Provided the same did not exceed the Quantity of one thousand Acres to each Person;" the reference of the petition to a " Committee of our Council; " the consent of the Council that letters patent grant to the petitioners " the Lands described in the said Petition according to the Prayer thereof; " the setting out by the " Commissioners appointed for the setting out all Lands to be granted within our said Province," for the petitioners the tract of land described by the identic description within the letters patent as by their certificate dated April 4, 1770, appears. The letters patent contain rental provisions, reservations, restrictions and conditions immaterial here.

The certificate of the " Commissioners appointed for the setting out all Lands to be granted within our said Province," bearing date of April 4, 1770, recited, *inter alia*, the presentation of the petition of the ninety-four, and certifying: " We the said Commissioners do hereby Certify that we have set out for the said Petitioners Henry Glen " and his associates, naming them, all that certain tract or parcel of land described precisely as is the land conveyed in and by the letters patent.

Anteceding the letters patent and the certificate of the commissioners were the acts: Henry Glen and ninety-three associates presented to Sir Henry Moore their petition bearing date November 26, 1766, setting forth the existence of a tract of about 150,000

acres of vacant land unpurchased of the Indians lying north of a tract " lately given by the Indians to Sir William Johnson " and praying for the grant of license " to Purchase in his Majesties Name of the Indian Proprietors thereof the Quantity of one hundred thousand Acres of the aforesaid tract of Land in order to enable them to obtain his Majesties Letters Patent for the Same upon the usual Quit Rent and Restrictions." This petition was referred April 27, 1768, to Sir William Johnson, was not acted upon, and has only historic importance.

June 11, 1768, native Indians belonging to the " Canojohary Castle and Proprietors of the Tract of Land hereinafter Described " by a deed of that date " in Consideration of one thousand Dollars and what is more agreed upon by Sir William Johnston Current Money of the said Province to us in hand well and truly paid by Isaac Vrooman, John Duncan, John Glen Jun$^r$ and Alexander Campbell (in behalf of themselves and their Associates) " did " Sell and release unto our Sovereign Lord George the third All that Tract of Land Scituate lying and being in the County of Albany on the North Side of the Mohawks River and Northerly of a Tract of Land lately Surveyed for Sir William Johnson beginning at the North West Corner of said Tract Laid out for Sir William Johnson, as aforesaid on the East bank of the Uppermost Canida Creek called by the Indians Teyogo, which said Creek Emptys into the Mohawks River at the German Flatts and Runs thence from Said Place of beginning Northeasterly along Said Teyogo Creek about Ten Miles be it more or less on a Straight Line untill a Line about South fifty Eight Degrees East (being parallel with the Rare Line of the aforesaid Tract of Sir William Johnson) Stricks along by the North Part of the Northermost of three Lak's, then along said Line the Same Number of Miles as Shall be found by Measuring the Aforesaid Rare Line of Sir William Johnson from one Canida Creek to the other, then in a Straight Line Southerly to the Northeast Corner of the aforesaid Tract of Sir William Johnson at the West bank of the first Canada Creek, called by the Indians Teayoharonde then along Said bounds of Sir William Johnson about North fifty Eight Degrees West to the Place where it first began Including both Canada Creeks as far as the said Tract doth Extend."

The Crown by a proclamation, issued in 1763, required persons desiring to secure a royal grant, to first secure from the Indians, as proof of friendliness, a grant or release to it.

In July, 1768, Isaac Vrooman made a survey manifestly for the purpose of locating the lands described in the Indian deed and defining the boundaries of the tract.

In the office of the State Engineer and Surveyor is a copy of a field book, the survey at the head of which is:

"true Copy of my field Book Keept on the Survey of a tract of Land in the County of Albany on the north Side of the mohaks river between the two Canada Creeks the one Called By the Indians teioga & the other Jerseyfield teeaioharonde & on the rear of a tract of Land I sur- Patent veyed for Sir Wilm Johnson in the year *1764,* which Said tract was purchased from the Canajohary Indians in June 1768, in the presence of his Excelency Sir henry more, at Johnson Hall by John Dunan John Glen Jnr Isaac Vrooman Esqr & others"

The words "Jerseyfield Patent" are obviously from the writing and the later date of the letters patent, not a part of the field notes.

The survey began at a marked white pine tree at the northeast corner of the land Isaac Vrooman surveyed for Sir William Johnson (known and designated as the "Royal Grant"), went upon the north or rear line of the Royal Grant north fifty-eight degrees west twenty-three miles, seven chains to Teyogo (West Canada) creek (the northwest corner of the Royal Grant), then northerly in various courses and distances along the creek until "the Indians (accompanying Vrooman 'Sent out with me by the Canajohary Cassile') tould me I was opposite the northermost the three small Lakes I went to the Lake with three Indians and three white men and rund from the northermost End of Said Lake N. 58° Wt 6 mile and one Chain to the Canada or teioga Brook & struck the same just above the upper end of the Large Island," then south fifty-eight degrees east to the middle of Stink lake, then south seventy-four degrees west to a point about seven chains east rly of the white pine tree at the northeast corner of the Royal Grant. The survey was completed July 30, 1768.

The line "south fifty-eight degrees east to the middle of Stink lake" is the "Transit Line" mentioned in the description in the complaint. It is also designated by the evidence the "Indian Line."

August 7, 1769, the petition of Henry Glen and ninety-three others, dated that day, was presented to Governor in Chief, Sir Henry Moore. It recited the procuring of the Indian deed of June 11, 1768, conveying "unto His said Majesty King George the third all their native and Original Indian right to a certain Tract of Land Situate in the County of Albany on the North side of the Mohawk River and Northerly of a Tract lately Surveyed for Sir William Johnson the same being more particularly bounded and described in the Indian Deed for the same in your Excellency's

hands to which reference being had may more fully appear," and prayed that letters patent issue to the petitioners " with the Quantity of One thousand Acres of the said Lands or with such quantity as the whole amount of the aforesaid Purchase will admit of Provided the same do not exceed the quantity of One thousand Acres to each person under the usual Quit Rents Reservations and Restrictions. And that in Order thereto a warrant of Survey may Issue for Surveying and Laying out the said Lands for Your Petitioners and their Associates."

August 22, 1769, the petition was read in council and referred to a committee and granted. September 13, 1769, the Surveyor-General of the Province was directed and required by the warrant to survey and lay out for the petitioners the tract of land described in the Indian deed, the description in which was in the warrant, and further directed to make return of what he had done; " together with a plott or Description of the Lands so surveyed thereunto annexed to the Intent that the Commissioners appointed for the Setting out of all Lands to be granted within the said Province (of whom the Surveyor General is to be one) may on the said Survey be the better enabled to set out for the said Henry Glen and his Associates the Tract of land hereinbefore Described, or a Quantity thereof not exceeding one thousand Acres each; to whom his late Excellency was advised by his Majesty's Council to Grant his Majesty's Letters Patent for the same   *   *   *."

November 10, 1769, the Surveyor-General made return to the warrant that he had " surveyed by my Deputy Isaac Vrooman for Henry Glen, Alexander Campbell, John Visgor Junior, Phillip Garlock, Harman H. Wendle, Alexander Ellice and eighty-eight other persons their Associates, All that Certain Tract of Land," and then follows, with precision, the description within the letters patent; together with a " Plott " or map thereunto annexed. There was not produced in evidence a field book or field notes of an actual survey made by or for the Surveyor-General pursuant to the warrant, or any proof that any boundary line of the tract was located upon the ground.

I am thus brought to the question: Is the line beginning at the northern end of the line 708 chains in length from the northeast corner of the Royal Grant, in the direction seventy-four degrees east, and thence passing north fifty-eight degrees west to West Canada creek, that is, the northern boundary line of the tract granted by the letters patent, the transit or Indian line, that is, the line " from the upper End of Island S. 58 E." to the middle of Stink lake?

35

The validity of the letters patent cannot be questioned. The letters patent were based upon the official survey of September, 1769. Preliminarily to their execution the commissioners set out the lands described by the survey as those to be granted. Under the evidence the presumption is conclusive that the officials who thus surveyed, set out and granted the lands acted in all respects within their lawful powers and duties. I must hold the grant valid and effective to the full extent of the description, even did it convey lands outside those described in the Indian deed. The recitals and references in the petition of August, 1769, the warrant of survey, the certificate of the commissioners and the letters patent prove, however, that the grant did not transcend the Indian deed. The commissioners did ignore or put aside the survey of Isaac Vrooman of July, 1768. It had not a binding nor an official effect. The Crown had complete freedom to ascertain and determine, keeping within the description of the Indian release, the lands to which the Indian deed related. The survey of Isaac Vrooman of July, 1768, did not and could not establish lines or monuments controlling the commissioners. It was not made in connection with or as part of the setting aside and grant of the commissioners. Those acts were based upon the survey made pursuant to the direction of " his Majesty's Lieutenant Governor and Commander in Chief of the Province of New York in America " to the Surveyor-General of September 13, 1769. That direction was that the survey should be of the tract of land described in the Indian deed. The courses of that deed " from said Place of beginning Northeasterly along said Teyogo Creek about Ten miles be it more or less on a straight Line until a Line about south fifty eight Degrees East * * * strikes along by the North part of the Northermost of three Lakes " are, however, far from being rigid and precise. The " northernmost of three lakes " is not a monumented point. A line in proximity to the north part of the specified lake satisfies the direction; and manifestly the Surveyor-General so conceived. Neither he nor his deputy Isaac Vrooman adopted in September, 1769, the survey made by Isaac Vrooman in July, 1768, by which the transit or Indian line was marked and located upon the ground. It was unheeded. They officially declared and presented for the purpose of the letters patent to be issued a survey apparently independent of and unrelated to that of 1768. Its eastern boundary line is substantially different from that fixed in the survey of 1768. Consequently its northern boundary line must be different.

The north or rear line of the Royal Grant is fixed and located upon the ground. Its eastern terminus — the white pine tree —

the northeast corner of a tract of land surveyed in the year 1764 by Isaac Vrooman for Sir William Johnson — is fixed and located upon the ground. Therefore the point from which runs the line, in direction north seventy-four degrees east, in length 708 chains, is certain and absolute. As to those facts the parties are in agreement. That line is by its description inflexible and precise. It defines with precision the width of the land granted. The northern terminus of that line has not any relation to the transit or Indian line.

September 15, 1769, and subsequent to the issuing of the warrant of survey for the grant to be made to Henry Glen and others, Deputy Surveyor-General Archibald Campbell entered upon a survey of lands contiguous to that grant on the east for Sir William Johnson. His field notes of the survey, dated November 17, 1769, state that it started at the corner of the Royal Grant — the white pine tree — and ran on a course north seventy-four degrees east, and followed it through the distance of 710 chains. The field notes and the map accompanying portray the conclusions that a line northerly from the white pine tree in the direction seventy-four degrees east, and in length 708 chains, would pass at a considerable and substantial distance west of Stink lake, and, intersecting the transit line, would pass north of it a substantial distance. Those conclusions are verified by the evidence and map of the plaintiff's witness Davis, to the effect that the easterly line of the tract granted by the letters patent of April 12, 1770, would intersect the transit line west of Stink lake and at the distance of $694\frac{1}{4}$ chains from the white pine tree, and extend about 14 chains northeasterly of it. The testimony of plaintiff's witness King is in accord with those conclusions. Without detailing the courses and boundary lines of surveys made in that period, involving the location of the northeastern corner of the Jerseyfield patent, the evidence proves that no survey made adopted or recognized the center of Stink lake as such corner; or the eastern part of the transit line as the northern boundary line of that patent. The transit or Indian line is not, by the letters patent of April 12, 1770, the true northern boundary line of the lands they granted.

The Brayhouse line is a line extending from a point 720.18 chains, on a course north seventy-four degrees east, from the northeasterly corner of the Royal Grant, on a course north fifty-three degrees thirty-one minutes west about 950 chains. Its existence originated in this way: December 23, 1793, the People of the State of New York, in virtue of their original ownership, granted by letters patent unto Jonathan Lawrence a tract of land described as containing 35,560 acres. The description of the deed stated its beginning point " the most Easterly corner of a tract of ninety-four

thousand acres of land granted to Henry Glen and others commonly called Jerseyfield," and its first line from that point, " as the needle pointed in the year one thousand seven hundred and seventy, to wit, North fifty eight degrees west along the North Easterly bounds of the said Tract of Land called Jerseyfield one thousand and sixty one chains to a Tract of Land Granted to Thomas Sickles." It followed the description contained in the return of an official survey, for the purpose of the grant rendered, together with a plot or map of the lands surveyed, to the Governor and Commissioners of the Land Office by Simeon DeWitt, Surveyor-General. The easterly boundary line is " South thirty-two degrees West Three hundred chains to the place of Beginning." The northerly boundary line is " parallel to the aforesaid Northeasterly Bounds of Jerseyfield South fifty-eight degrees East one thousand three hundred and eighty two chains." It was known as the Lawrence patent. In 1806 an allotment survey, in partition, of the Lawrence patent was made. It made the southern boundary of the partitioned lands the Brayhouse line as just defined by me. Therefore, it was at its eastern end, on the course north seventy-four degrees east, 12.18 chains northerly from the east end of the true northern boundary line of the Jerseyfield patent. The Brayhouse line is not, by the letters patent of April 12, 1770, the true northern boundary of the lands granted by those letters patent. The partitioned and allotted lands of the Lawrence patent did not include the land south of the Brayhouse line. The title to it remained vested in the then owners of the Lawrence patent. Undisputedly the lots 88 and 89 of the defendants do not extend northerly beyond the true north line of Jerseyfield. Undisputedly the land north of those lots and south of the Brayhouse line has been granted to the plaintiffs.

The title to and ownership of the tract of land granted by the letters patent of April 12, 1770, were by them vested in the patentees or grantees. The description within and the survey connected with them defined the lands granted. The description was certain, not ambiguous, precise and inflexible, not indefinite nor yielding. It and the grant were not affected by a prior survey or a subsequent survey or grant. I find that neither the Indian line nor the Brayhouse line was surveyed or fixed or marked or located upon the ground at the time and as part of the grant of April 12, 1770.

Differences in the methods, correctness or attention in surveying as done in 1770 and as done in modern years cannot change the clear and definite boundaries of the grant of either the Jerseyfield or Lawrence patent.

The defendants assert and argue as a defense that the predecessors

in title of the plaintiffs accepted and acquiesced in the location of the Brayhouse line as the true northerly line of the Jerseyfield patent and the true southerly line of the Lawrence patent, and because of such acquiescence are estopped from alleging and proving otherwise. They put forward as the evidence supporting the assertion the survey and allotment in the partition of 1806 of only that part of the Lawrence patent lying north of the Brayhouse line as an acknowledgment that that line was the true boundary line between the Jerseyfield and Lawrence patents. They further urge that through a great period after the allotment the owners of lots in those patents did not question its reality and validity as such boundary line. The evidence produced before me does not support the assertion. It establishes that the owners of the Lawrence patent at the time of the partition remained after the partition the owners of the land between the Brayhouse line and the true northern boundary line of the Jerseyfield patent. The land then was and at all times since has remained almost entirely, if not wholly, wild, unoccupied, unfenced and uncultivated. Prior to the grants of 1901 to the plaintiffs no dispute or question arose between them or their successors in title, on the one hand, and the then owners of lots 88 and 89 of the Jerseyfield patent or their successors in title, on the other hand, concerning the precise location of the northern boundary line of those lots; lots 88 and 89 were known to exist, but whether they extended north of the Indian or transit line or of the true northern boundary line of the Jerseyfield patent or to the Brayhouse line was not under consideration or questioning at any time prior to that date by the then owners of those lots and the then owners of the lands contiguous on the north. The last named owners may not, under the evidence, have had knowledge of their ownership. The partition action had no relation to the owners of lots 88 and 89. It did not affect to any extent their rights. The acquiescence of the owners of the Lawrence patent was in their own acts. They were not acquiescing in any acts of those owners. No transaction arose prior to the date mentioned which gave rise to any words or acts on the part of those owners constituting ratification of a claim, by word or act, of their owners, that those lots 88 and 89 extended beyond the true northern boundary line of the Jerseyfield patent; or constituted a duty to refute or dispute the claim. Acquiescence rests either upon the principle of ratification or that of equitable estoppel. (*Pollitz* v. *Wabash R. R. Co.*, 207 N. Y. 113.) It is manifest that the evidence does not permit either principle to bar the plaintiffs from alleging and proving that the Brayhouse line is not the true northern boundary line of Jerseyfield.

Court of General Sessions, New York County, January, 1927.    [Vol. 128

The facts I have already stated forbid the conclusion that the principle of practical location makes the Brayhouse line the northern boundary line of the Jerseyfield patent.    (*Adams* v. *Warner,* 209 App. Div. 394.)

Manifestly the judgment in the case of " The People of the State of New York against James C. Livingston and Charles Bowers " is not *res adjudicata* of the validity and enforcibility of the plaintiffs' title involved in this action.    Nor do I think the rule of *stare decisis* should be applied by me.    The findings of fact of the learned and painstaking judge who awarded the judgment induce the conviction that the undisputed evidence presented to me establishes material facts which were unproven before him, and in an extent make inapplicable the reasons given by him for the judgment.    Dissimilarity in relevant facts may well interdict the application of the rule.

Upon the trial the defendants' counsel offered in evidence various documents within the judgment roll in the action of The People of the State of New York against James C. Livingston, Sr., and Charles Bowers.    Plaintiffs' counsel objected on grounds stated by him to the reception of each of the papers.    With the consent of the respective counsel, I reserved my ruling as to each objection until my decision of the case; the party ruled against to be given an exception to each ruling.    I now overrule each objection and give to p'aintiffs an exception to each such ruling, and the minutes of the trial may be so amended as to state such ruling and exception.